IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| CHI TU, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 07-968-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| KAISER FOUNDATION HEALTH PLAN | ) | |
| OF THE NORTHWEST and DENISE | ) | |
| FRENCH, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

Daniel Snyder
Matthew C. Lackey
1000 S. W. Broadway, Suite 2400
Portland, Oregon  97205

       Attorneys for Plaintiff

Chris Kitchel
Marc E. Alifanz
Stoel Rives, LLP
900 S. W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

       Attorneys for Defendants

KING, Judge:

Plaintiff Chi Tu worked as a dental lab employee at defendant Kaiser Foundation Health Plan of the Northwest ("Kaiser"). Tu claims she was subjected to harassment from her co-workers serious enough to cause mental disorders. She alleges claims for race and national origin discrimination under Title VII and ORS Ch. 659A, disability discrimination under the Americans with Disabilities Act and ORS Ch. 659A, workers' compensation discrimination under ORS Ch. 659A, and the torts of assault and battery and the intentional infliction of emotional distress against both Kaiser and defendant Denise French, a co-worker. Before the court are Defendant Kaiser's Motion for Summary Judgment (#42) and Defendant Denise French's Motion for Summary Judgment (#53).

For the reasons below, I dismiss Tu's claims for injured worker discrimination; her claim against Kaiser for assault, battery, and intentional infliction of emotional distress; her disparate treatment and hostile environment claims for race discrimination; all of her retaliation claims, and her disparate treatment disability discrimination claims. Remaining for trial are Tu's assault, battery, and intentional infliction of emotional distress claims alleged against French, and Tu's failure to accommodate disability claims.

## OBJECTIONS TO THE EVIDENCE

Defendants object to large portions of affidavits filed by Tu and Mary Ann Sierks and Tu objects to much of the evidence submitted by defendants. Although I have reviewed each objection, I will not rule on them individually. I provide the following general comments.

Many of the objections are for lack of relevance. If I include a fact in this opinion, I consider it relevant. If I do not include a fact, I do not consider it relevant to my analysis,

whether or not there was an objection. Although defendants may move against a claim on multiple grounds, I often only rule on the one or two strongest arguments.

Many other objections are for hearsay. Declarations containing hearsay are admissible for summary judgment purposes if the hearsay could be presented in an admissible form at trial. The court is to focus on the admissibility of the contents of the evidence and not on the admissibility of the evidence's form. Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003) (contents of plaintiff's diary were admissible to oppose a motion for summary judgment); J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (declaration from a buyer about competitors prices based on information from the buyer's company's sales force is admissible in summary judgment because there is no indication the sales force could not testify at trial); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001) (declaration summarizing declarant's discussions with city personnel workers about other employees' suspensions was inadmissible because declarant was not involved in the suspensions, did not personally review business records about the suspensions, and relied on unsworn information from the personnel workers' whose sources were unclear).

Kaiser objects to paragraphs in which Tu or Sierks testify to derogatory racial remarks they heard in the workplace. These statements are not hearsay because Tu is not offering them for the truth of the matter asserted. Calmat Co. v. United States Dept. of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004) (testimony about racial slurs said to the witness is not hearsay because it is offered as evidence that racially-offensive speech occurred at the workplace).

Some of the hearsay objections are to Tu's or Sierks' explanation of what a document says. If the document is in the record, I have interpreted it myself.

In paragraph 25 of Tu's Affidavit, she states that she observed dental lab managers treating Asian workers differently from Caucasian workers, that she heard derogatory comments from co-workers, lead workers, and managers about Asians, and that there is a history of Asians being denied promotions and assigned more work or harder work. Affidavits opposing summary judgment must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). This paragraph is too general to create a factual issue. I will rely, however, on Tu's other testimony concerning specific incidents.

In paragraphs 32 through 38 of Tu's Affidavit, she gives several examples of Caucasians being hired instead of Asians for open positions in 2001 and 2002. These events all occurred years before the limitations period in this case. Because they are discrete events, the continuing violation doctrine does not make them relevant, as discussed below. Furthermore, these events did not involve Tu. Finally, Tu does not complain about her starting wage because she was hired at the top of the scale as a specialist, the highest nonmanagement position.

Kaiser raises numerous objections to Tu's descriptions of the physical symptoms of her emotional upset. Defendants argue that Tu cannot raise a factual issue that she suffered extreme emotional distress. Therefore, this evidence is relevant to Tu's intentional infliction of emotional distress claim.

## FACTS[1]

I.    Tu's Employment Prior to 2004

Kaiser's dental laboratory, managed by Cal DeCicco, is split into two departments: the fixed department, managed by Chuck Durst, and the removable department, managed by Lynn

---

[1] The parties dispute many of the facts. As required in a summary judgment motion, I use Tu's version of the facts if the difference is material.

Ellis.  The entire dental laboratory is in one large room except for the porcelain room in the fixed department, which is located in its own enclosed room within the larger dental laboratory.

Chi Tu, an ethnic Chinese woman born in Vietnam, is now 53 years old.  She is a small woman, only 4 feet 11 inches tall and weighing about 90 pounds.  Tu began working for Kaiser as a specialist in the fixed department in August 2000.  At the time Tu was employed in the dental lab, about 15 percent of the 34 nonmanagement employees in the lab were of Asian descent.  She was a member of the Oregon Federation of Nursing and Health Professionals ("Union") and subject to a collective bargaining agreement ("CBA").  Tu received positive performance evaluations.

Tu heard a few racially derogatory remarks during her employment.  In December 2000, Tu heard Caucasian co-worker John Barker say to Durst, "Asians have to do more work."  Tu Aff. ¶ 29.  In March 2001, Caucasian co-worker Aurel Micurescu said to Tu, "Are you here to steal people's jobs?"  Id. ¶ 31.  Tu complained to Durst and Micurescu apologized to Tu.  In January 2003, lead technical worker John Barker told Mary Ann Sierks that she should not use the women's restroom downstairs because the Asian women use that bathroom and "Asians are dirty."  Sierks Aff. ¶ 11.  Sierks related this comment to Tu.  In spring 2003, Tu heard Caucasian lead worker Steve Stephenson say to Durst, "Give it [work] to Chi.  She needs to work harder.  Asians need more work.  They need to work harder."  Id. ¶ 41.

In summer 2003, Tu asked Durst to move her out of the porcelain room because Kathy Pawson kept falsely accusing Tu of stealing her tools.  Pawson objected that Tu, on the request of a more senior employee, traded her smaller personal locker with the more senior employee's larger locker.  Tu also had concerns about Stephenson's behavior.  Durst refused to move Tu because he wanted her to sit next to the lead worker, Stephenson.

II.    <u>Tu's Employment in 2004</u>

On March 5, 2004, Stephenson asked Tu to go with him to tell Durst that people were talking too much and wasting time. Tu and Stephenson made the report to Durst, who scheduled a meeting on March 8, 2004 in the porcelain room. The meeting took from one to two hours. Tu was the only Asian in the room. Durst told the group that he called the meeting because Tu complained that there was too much talking at work. This angered Tu's co-workers and the meeting degenerated into several of them shouting at Tu. Stephenson did not own up to the fact that it was his idea to raise the issue with Durst and Durst lost control of the meeting.

Tu's co-workers remained very angry with her. Seven additional meetings were held in the porcelain room during the next two weeks. All of the meetings had an angry tone with Tu's co-workers blaming her for causing trouble. Hugo Miller pointed at Tu and said he was going to take her out and do something to her. Tu commented that they are paid to do eight hours of work and not piece work. Kasha Teegarden loudly told Tu, "This is not Viet Nam," to stop Tu from talking. After a few days of being berated at meetings, Tu asked Durst why he was letting people yell at her. Durst told Tu, "Oh, they are mad, let them yell for a few days. Let them get it out of their system." <u>Id.</u> ¶ 51.

In June 2004, Durst would not allow Tu to combine her lunch and breaks. Tu had witnessed Caucasian employees do this and thought the CBA allowed it. Durst tried to check with the Union steward but could not find her. Tu confirmed with the steward later that day that lunch and breaks could be combined. Durst then allowed Tu to do so.

In August 2004, Tu went to see Sharon Culley, a Kaiser Employee Assistance Program ("EAP") counselor, in part to complain about comments made about Asians. Culley also spoke with some other dental lab employees, mostly about extreme inefficiency and financial abuse in

the lab.  Tu authorized Culley to forward a description of the problems to the Kaiser Compliance

Office.  In August 2004, Mary Jo Gardner, a Kaiser compliance officer, met with Tu, who told

Gardner that she was discriminated against because of her race.  There was no follow-up from

Gardner or anyone else in the Compliance Office.

III.    Tu's Employment in 2005

Tu had a run in with Stephenson in May 2005 about her willingness to work overtime and

in September 2005 about Stephenson's assigning more work to Tu than she could complete in a

day.  Tu complained about both incidents to DeCicco in September 2005.  He assured Tu that he

would talk to Stephenson and get back to her but he never recontacted Tu.

EAP counselor Culley referred Tu to Dr. Paul Leung, a psychiatrist at Oregon Health

Sciences University.  Tu first saw Dr. Leung on October 4, 2005.

On October 20 Dr. Leung gave Tu a note:

> [Tu] is currently under my clinical care.  It is my professional opinion that
> due to a very unfriendly and hostile working environment she has been distressed
> greatly.  I would advocate for a change of work site or position to avoid further
> damage done to her health and mental health condition.

Tu. Aff. Ex. 23.

Tu gave the letter to DeCicco on October 24.  He got mad, turned red, and waved the

letter very close to her face.  Tu explained all of the harassment from her co-workers, including

the comments about Asians and her report of discrimination to Gardner.  Tu asked DeCicco to

move her work station, change her job assignment, or transfer her into a different department.

DeCicco asked Tu what was wrong with her.  She told him she had anxiety and depression and

could not sleep.  DeCicco told Tu she could not transfer but that she could sit outside the

porcelain room if she wanted.  He also said he would talk with a few co-workers about switching

work stations with Tu.  Both Miller and Michael Savage did the same porcelain work as Tu but

sat outside the porcelain room.  DeCicco said he would talk to Human Resources about the

doctor's note and Tu's request to move.

Tu was up with a sick child all night on October 24.  She intended to call in at 5:30 AM

but the new medication prescribed by Dr. Leung caused her to sleep later than that.  Her usual

start time is 6:00 AM.  Tu claims Caucasian workers in the dental lab frequently fail to call in

when they are late or absent and their behavior is tolerated.

Durst called Tu at 6:30 AM. on October 25.  When Tu explained, Durst told her it was

not a problem and to stay home with her child.  They agreed that Tu would take approved sick

leave in the morning and come in at noon.  She actually punched in at 11:03 AM.  Durst showed

Tu a written copy of the policy and told her she had to comply with it.  Durst has spoken to five

other employees in 2005 about attendance issues prior to his discussion with Tu.

On October 31, Tu met with DeCicco; Shawn Ferguson, Senior Human Resources/Labor

Management Consultant; Durst; and Sierks to discuss Dr. Leung's note.  Tu told Ferguson about

the harassment because she was Vietnamese.  She also told him about her anxiety and depression

and that she needed to transfer or be moved out of the porcelain room.  Ferguson told Tu she

could do neither until he investigated by talking to some of her co-workers.  Tu was never moved

based on this request.  When Ferguson started talking to some of Tu's co-workers, they resented

Tu even more and her work environment worsened.  During this time, Tu heard additional

remarks from Barker and Stephenson that more work should be given to the Asians.

Tu saw Caucasian co-workers get moved in and out of the porcelain room and between

the fixed and removable departments.  She believes that Savage and French were moved because

they were not getting along with co-workers. Tu believes that Lawer was moved after bringing a note from her doctor saying she should be moved to another area.

On November 4, Tu was approved by a Kaiser nurse practitioner and Dr. Leung for sick leave through November 21 due to stress and anxiety.

On November 7 Tu's Union filed a grievance alleging that Kaiser discriminated against her and asked that she be transferred to another department. Kaiser's investigation did not substantiate the grievance.

IV.    Tu's Employment in 2006

In December 2005, Tu successfully applied for a technician job in the removable department across the lab and began the new job in February 2006 under Ellis. Tu only applied for the job because Kaiser would not move her work station out of the porcelain room. Tu's salary was reduced from her prior specialist pay to the lower technician's pay. Tu claims that she was unaware she would receive a pay cut until after she had started the new job. Ferguson had made this clear to the Union but the information apparently was not passed on from the Union to Tu. The Union filed a grievance over the pay cut and Kaiser denied it.

On March 3, 2006, a two-month temporary specialist position opened in the removable department. DeCicco told Tu that she could not apply because she was on probation in her new job. Kaiser now relies on a provision in the CBA that an employee cannot apply for another position during the first three months in a new position. The Union filed a grievance alleging that Kaiser denied Tu the right to fill the open position. Kaiser denied the grievance on April 28.

In July 2006, Kaiser offered Tu a specialist position in the fixed department. Tu would work for Hugo Miller and could sit out in the main part of the lab instead of in the porcelain room. Tu declined the position because she did not feel ready to return to the fixed department.

Page 9 - OPINION AND ORDER

DeCicco also could not agree to all of the conditions Tu put on taking the job but she now cannot remember which were unacceptable.

Tu filed a BOLI charge on September 5, 2006, which was dismissed on March 27, 2007.

A co-worker, Denise French, shot rubber bands and threw small pieces of soft dental material at Tu on an almost daily occurrence. Sometimes these things hit Tu and at other times they landed on the floor or on her workstation. Other employees also engaged in this horseplay but it irritated Tu because she found it distracting. One time Tu warned French not to throw the dental material on the floor. French said to Tu, "You can't do anything about it. You are short, ugly, Asian woman." Tu Aff. ¶ 96. Tu never reported French's throwing behavior or derogatory comment to management because she was afraid the harassment would worsen.

Tu and other employees in the removable department have a wooden-handled instrument called a waxiron spoon. It is about eight inches long, including a four and one half inch wooden handle, and has a narrow oval metal end. The waxiron spoon sits on a flame and is kept red hot to melt wax.

On September 7, 2006, French approached Tu, grabbed the red-hot heated waxiron spoon from Tu's work bench, and waved it around Tu's chest and in Tu's face. Tu was very frightened because French appeared upset. French pinned Tu against the work bench by holding her left hand on Tu's shoulder and arm. French is much bigger than Tu, with French being six feet one inch tall and weighing about 265 pounds. Tu could not get away from her. French said to Tu, "Are you scared? Are you scared? You should be. You chicken shit. I could burn you right now." Id. ¶ 104. French continued this behavior for five to ten minutes. Tu begged French to stop and repeatedly asked her to put the tool down. French then pointed the hot waxiron toward her own stomach and continued the taunting. Tonya Swindell, a former supervisor in the

department, twice told French to put the tool down before French finally stopped and walked

away.  Supervisor Ellis was away from the department when this happened.  Tu claims that no

one, including Ellis, talked to her about the incident that day.  Swindell did not observe Tu to be

overly upset or concerned.  Tu returned to her work immediately, was not crying, did not go to

the restroom, and worked her entire shift.  Swindell did not think French intended to hurt Tu but

instead was acting immaturely and thoughtlessly.  French later apologized to Tu and claims she

did not intend to hurt her or cause her emotional distress.

   The next day, Ellis spoke to Tu after Swindell reported French's conduct to Ellis.  Ellis

told Tu she was sorry about what French did and said it was inappropriate.  Ellis said she would

talk to French when she got to work.  Ellis asked Tu if she was "OK," and Tu replied that she

was "OK" even though she was actually upset.  Tu did not say anything else to Ellis about the

incident.  Ellis told French that any future incidents would not be tolerated.  French was not

moved and Tu had to continue working near her.

   After the hot waxiron incident, Tu kept having recurring memories of the event which

were extremely upsetting to her.  While at work on September 15, Tu had the first episode of

dizziness, shaking, blurred vision, and a cold sweat.  She also had recurring flashbacks of French

holding her chair and shoulder and threatening her with the hot waxiron and at times would get

sores around her mouth from the stress and her nervousness.  Tu received medical care at Kaiser

on September 18 and October 16 for the symptoms.  She was diagnosed by a physician's

assistant with adjustment disorder and herpes simplex aggravated by stress.  On November 17,

Tu saw a family nurse practitioner for her emotional problems, was referred back to Culley at the

Kaiser EAP, and referred back to Dr. Leung.

On December 7, Dr. Leung gave Tu a note stating: "This is to inform you that I have advised the above said person to stay off work for six months or when there is a resolution of workplace problems including harassment & threats to her physical safety." Tu. Aff. Ex. 19. Ellis called Tu about the note on December 11 but did not ask if there was anything she could to modify Tu's environment so she could return to work. Prior to this phone call, Ellis claims that she did not know Tu had any concerns about the workplace. In a letter dated December 15, Ellis explained to Tu her rights under the CBA concerning a medical leave. Ellis also stated that she was willing to meet with Tu to discuss her concerns about the workplace and that she would support having a respectful and appropriate workplace for Tu.

V.      Tu's Employment in 2007 and 2008

On January 18, 2007, Tu filed a workers' compensation claim alleging that her encounter with French in September 2006 caused her to have a mental disorder. The claim is still pending.

Tu filed a second BOLI charge on March 16, 2007, which was dismissed when she filed this action in August 2007. The Union filed new grievances on January 15 and July 10, 2007 which are still pending.

In early 2007, EAP counselor Culley put Tu in contact with the Kaiser Integrated Disability Management program which assigned her to work as a bilingual greeter for patients in a medical clinic. Tu worked this job for three months. The clinic director attempted to hire Tu as a phlebotomist but could not get approval when Human Resources determined that Tu was not qualified. No one at Kaiser discussed possible accommodations with Tu so that she could return to the dental lab.

Starting in September 2007, Tu applied for about a dozen jobs at Kaiser outside the dental lab. She was not interviewed for any of the positions. For each position, the Union told

Tu that it would contact Ferguson, in Human Resources, to inform him that Tu was applying.

Ferguson never contacted Tu to discuss possible accommodations or available positions.

Ferguson states that he had no role in deciding if Tu would receive any of the open positions.

Tu began working full time for another dental lab in January 2008. She never asked her

new employer for any accommodation nor mentioned her alleged disability.

Tu still suffers from depression and anxiety. She continues to have frequent nightmares

of distressing events at work, sleeps at most from 10:00 PM to 3:00 AM, never feels like she gets

a good night's sleep, is easily startled and frightened, is unable to focus her thoughts, is unable to

have sex with her husband, and has not driven in six months due to concentration problems. Her

work output has slowed down and she has trouble meeting her production requirements at the

new job. Medication has not eliminated the symptoms.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party. Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

I.    Race and National Origin Discrimination

Tu alleges claims against Kaiser for race and national origin discrimination pursuant to Title VII and ORS Ch. 659A, under the theories of disparate treatment, hostile environment, and retaliation.

A.    Disparate Treatment

Kaiser argues that Tu's disparate treatment claim must fail because Tu suffered no adverse employment action.  Kaiser contends that none of the conduct Tu complains of affected the terms and conditions of her employment.  It also argues that many of the events Tu relies on are outside the limitations period.

Tu contends that the following conduct is a series of adverse employment actions:  (1) not promoted to specialist position in the porcelain department in January 2002; (2) in spring 2003, she was assigned more work by Stephenson, harassed by Pawson, and not allowed to transfer from the porcelain room; (3) abused and physically threatened by co-workers in front of Durst in a meeting held in March 2004; (4) not allowed to combine lunch with other breaks in June 2004; (5) assigned excessive work by Stephenson in September 2005; (6) not allowed to transfer out of porcelain room in October 2005 and then transferred to specialist waxup work but paid at the lower technician level and put on 90-day probation in contravention of the CBA; (7) denied a transfer to temporary specialist position in the removable department in March 2006, in contravention of the CBA; (8) although offered a specialist job in the fixed department in March 2006, DeCicco required Tu to work in the porcelain room; and (9) assault by French in September 2006 was not investigated properly and French was not disciplined.

To prove a Title VII disparate treatment claim, a plaintiff must establish a prima facie case of discrimination.  A prima facie case may be demonstrated by direct evidence of discriminatory intent or may be based on a presumption arising from factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Noyes v. Kelly Services, 488 F.3d 1163, 1168 (9th Cir. 2007).  Generally stated, the factors are:  (1) membership in a protected class; (2) qualification for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) different treatment than those similarly situated outside of the protected class.  McDonnell Douglas, 411 U.S. at 802.

Under Title VII, a person in a deferral state must file an administrative charge with the EEOC within 300 days of the last alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  Under state law, if the employee chooses not to file an administrative complaint, the civil action must be filed no later than one year after the occurrence of the alleged unlawful employment practice.  ORS 659A.875(1).  Tu filed her first BOLI complaint on September 5, 2005.  Thus, the limitations period is September 5, 2005 for her state claims and November 9, 2005 for her Title VII claims.

The Supreme Court clarified the continuing violation doctrine in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002), and how it applies differently to discrete acts of discrimination than to hostile environment claims.  Title VII precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period, even when they are related to acts alleged in timely-filed charges.  An employee may use prior acts as background evidence in support of a timely claim.  Id. at 105, 113.

When an employee alleges a series of violations of Title VII, or a series of actionable wrongs, as opposed to a hostile work environment, he must file a timely EEOC charge with

respect to each discrete alleged violation.  Ledbetter v. Goodyear Tire & Rubber Co., Inc., __

U.S. __, 127 S. Ct. 2162, 2175 (2007).  Thus, in Tu's disparate treatment claims, which are for

discrete acts of discrimination rather than for a hostile environment, the continuing violation

doctrine does not apply and the limitation periods are September 5, 2005 for the state claim and

November 9, 2005 for the Title VII claim.

     In the disparate treatment claims under state and federal law, I begin by considering Tu's

list of actions and determine if each is barred by the statute of limitations.  The first four actions

all took place before September 5, 2005 and are barred by both statutes of limitations.

     Now I will consider whether the remaining actions are adverse employment actions.

     An adverse employment action is one that materially affects the compensation, terms,

conditions, or privileges of employment.  Davis v. Team Electric Co., 520 F.3d 1080, 1089 (9th

Cir. 2008) (disparate treatment claim).

     Tu complains that in September 2005, Stephenson assigned more work to her than she

could complete.  The assignment of more burdensome work responsibilities can be an adverse

employment action sufficient for a prima facie case in a disparate treatment claim.  Id.

(assignment of more strenuous work and work with hazardous substances is sufficient to make

prima facie case).  Tu's situation was an isolated occurrence and did not result in any type of

discipline, reduction of salary, or requirement to work overtime.  There were no consequences

from the fact that Tu did not finish the work at the end of the day.  There was nothing hazardous

or more strenuous about it.  Thus, the nature of Tu's differing work assignment is quite unlike

that in Davis and does not rise to the level of an adverse employment action.

     Tu's next complained-of events are that she was not allowed to transfer out of the

porcelain room in October 2005, was transferred to specialist waxup work but paid at the lower

technician level, and was put on 90-day probation in contravention of the CBA. Tu does not point to a specific job that she was not allowed to transfer to in October 2005. DeCicco did tell Tu that she could move her seat outside the porcelain room but Tu did not do so. Tu was not transferred to the waxup work but applied for and won the job. Although Tu did not know prior to the move that she would be paid at the technician level, all of the evidence shows that the job was approved at the technician level prior to Tu's application. DeCicco did tell Tu that she was on a 90-day probation. Even if this was an incorrect application of the CBA, it did not affect Tu in any way and was not used to prohibit Tu from transferring to a temporary position, as discussed next. In sum, Tu requested some of these complained-of events and others have no evidentiary support. None of these actions affected the compensation, terms, conditions, or privileges of employment so none are adverse employment actions.

Next, Tu contends that she was denied a transfer to temporary specialist position in the removable department in March 2006, in contravention of the CBA. The evidence does not support this argument. The CBA does state that Bargaining Unit employees are given preference over outside applicants and may elect to fill temporary positions. DeCicco Decl. in Supp. of Kaiser's Reply Ex. 1 at 24 Art. 7B.5 and 7. The CBA also says that an employee must have completed at least three months of service in their present position to be eligible to apply for transfer. Id. Art. 7B3. The more specific provision would apply over the more general provisions. Tu had been in her new position about a month. Although the requirement can be waived, there is no evidence that it ever was. Thus, there is no evidence that Tu was wrongfully denied the ability to transfer to the temporary position.

Tu then complains that although she was offered a specialist job in the fixed department in July 2006,[2] DeCicco required her to work in the porcelain room. Tu put several conditions on taking this job but Kaiser would not agree to them. Tu then declined the job because she did not feel ready to work in the job as it was posted without the changes. This claim is more appropriately one for lack of accommodation for a disability. Under Title VII, Tu is not entitled to any change in the job. Therefore, I will not consider this as an adverse employment action for the Title VII disparate impact claim.

Tu's last event on which she bases her disparate treatment claims is that the assault by French in September 2006 was not investigated properly and French was not disciplined.

> Morgan [National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002)] distinguished between "discrete" acts of discrimination and a hostile work environment. A discrete act of discrimination is an act that in itself "constitutes a separate actionable 'unlawful employment practice' " and that is temporally distinct. Morgan, 536 U.S., at 114, 117, 122 S. Ct. 2061. As examples we identified "termination, failure to promote, denial of transfer, or refusal to hire." Id., at 114, 122 S. Ct. 2061. A hostile work environment, on the other hand, typically comprises a succession of harassing acts, each of which "may not be actionable on its own." In addition, a hostile work environment claim "cannot be said to occur on any particular day." Id., at 115-116, 122 S. Ct. 2061. In other words, the actionable wrong is the environment, not the individual acts that, taken together, create the environment.

Ledbetter, 127 S. Ct. at 2175.

The lack of investigation and discipline of French are not individual acts that occurred on any particular day. These events will be considered in the hostile environment claims but are not adverse employment actions which can support a disparate treatment claim.

---

[2] Tu's brief actually refers to this as the March 2006 offer. Kaiser notes that there is no evidence of, and it is unaware of, any job offer in March 2006. Both Kaiser and I assume that Tu is referring to the July 2006 offer.

In summary, the events on which Tu relies to support her disparate treatment claim are either barred by the statute of limitations or are not discrete adverse employment actions. Consequently, I grant summary judgment and dismiss the Title VII and ORS Ch. 659A disparate treatment race and national origin discrimination claims.

      B.     <u>Hostile Environment</u>

Kaiser seeks summary judgment on Tu's hostile environment claim on several grounds. It argues that nearly all of the conduct falls outside the applicable statute of limitations period. Even if all of the conduct is considered, Kaiser contends that it is neither severe nor pervasive enough to support a hostile environment claim.

Tu argues that the continuing violation doctrine allows the court to consider all of the conduct, including the acts which otherwise would be time barred.

"[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." <u>Morgan</u>, 536 U.S. at 105. To determine if all of the acts "constitute one unlawful employment practice," the court considers if the acts "were sufficiently severe or pervasive, and whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers." <u>Porter v. California Dept. of Corrections</u>, 419 F.3d 885, 893 (9th Cir. 2005) (internal citation omitted).

Oregon courts borrowed the concept of the continuing violation doctrine as found in federal case law. <u>See</u> <u>Dobie v. Liberty Homes, Inc.</u>, 53 Or. App. 366, 369, 632 P.2d 449 (1981) (failure to reinstate an injured worker).

Tu points to the racial slurs, the co-workers' harassment of her in front of Durst at the March 2004 meeting, and all of the conduct above which Tu characterizes as blatant disparate treatment. She argues that in total, the conduct is severe and pervasive enough to support a hostile environment claim.

> In determining if an environment is so hostile as to violate Title VII, we consider whether, in light of "all the circumstances," Nichols v. Azteca Rest. Enter., 256 F.3d 864, 872 (9th Cir.2001), the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor, 477 U.S. at 67, 106 S. Ct. 2399 (internal brackets and quotation marks removed). The Supreme Court has followed a "middle path" with regard to the level of hostility or abuse necessary to establish a hostile work environment. Harris v. Forklift SYS., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993). Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII. Id. However, the harassment need not cause diagnosed psychological injury. Id. at 22, 114 S. Ct. 367. It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." Steiner, 25 F.3d at 1463.
>
> A plaintiff must show that the work environment was both subjectively and objectively hostile. Nichols, 256 F.3d at 871-72. . . .
>
> In evaluating the objective hostility of a work environment, the factors to be considered include the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Nichols, 256 F.3d at 872 (quoting Harris v. Forklift SYS., 510 U.S. at 23, 114 S. Ct. 367). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." Id. (internal quotation marks omitted).

McGinest v. GTE Service Corp., 360 F.3d 1103, 1113 (9th Cir. 2004). The objective hostility of the workplace is analyzed from the perspective of the plaintiff. Id. at 1115.

I will assume that all of the conduct in the record can be considered under the continuing violation doctrine. To summarize, Tu heard five racially derogatory remarks from co-workers between December 2000 and March 2004. There were no remarks at all between March 2001

and January 2003. Tu also relies on the following: (1) five incidents when she was not moved or transferred as requested; (2) two incidents when she was assigned excessive work; (3) physical abuse or threats during the meetings in March 2004 and by French in September 2006; and (4) nonracial verbal abuse by Pawson in the summer of 2003 and by co-workers during the meetings in March 2004.

All of these incidents and remarks are well separated in time except for the abuse during the eight meetings in March 2004. During those meetings, however, there was only one direct reference to Tu's race. Many of the cases in which plaintiffs survive summary judgment have much more frequent hostile comments directed at the plaintiffs, at times rising to the level of remarks on a daily basis. Moreover, many of these successful plaintiffs are subjected to much more extreme racial slurs. For example, in McGinest, during a 10 to 15 year period, the plaintiff was called "stupid nigger," "stupid," "Aunt Jemima," "mammy," and "sparrow brain"; and was told "you should stay in Long Beach where you belong, with your kind," and "I'll retire before I work for a Black man"; and was compared to the "other colored guy" who would jump when given an assignment. Id. at 1109-10. Graffiti of "nigger," "white is right," and "PONTIAC (meaning poor old nigger thinks it's a Cadillac)" was regularly painted on the walls of the bathroom, the switchbox, and in the blockhouse and garage for long periods of time before being painted over, even though management used these rooms often. In addition, the plaintiff worked for a supervisor who provided him with insufficient equipment and crew members to perform his job, was not paid for overtime when white co-workers got overtime bonus pay in addition to overtime they actually worked, had subordinates refuse to work for him because of his race, and was injured in a car accident because a tire blew out after plaintiff could not get the garage to

replace it.  Id. at 1107-09.  The court held that plaintiff raised a factual question on the existence

of a racially hostile workplace.  Id. at 1118.

In contrast, Tu was subjected to less frequent and less offensive conduct.  Her work

environment was more comparable to the one described in Manatt v. Bank of America, NA, 339

F.3d 792 (9th Cir. 2003) (plaintiff was an American citizen of Chinese descent).  Over a two-

and-a-half year period:  (1) Manatt overheard a co-worker tell her supervisor, "I am not a China

man, I'm not like China man with their eyes like that," which caused her supervisor to smile;

(2) the supervisor told Manatt, "I've had the worse kind of trouble with your countrymen;"

(3) co-workers laughed during a conversation about "China man" and "rickshaw," saw Manatt,

and pulled their eyes back with their fingers to mock the appearance of Asians; (4) Manatt

overheard jokes on several occasions about "China man"; (5) Manatt heard a co-worker refer to

Chinese as those "communists from Beijing"; and (6) Manatt was ridiculed, apparently for

several minutes, in front of a few people for her mispronunciation of Lima, Peru and was referred

to as China woman during the incident.  Id. at 795-96.  The court granted summary judgment

after concluding that the conduct was neither severe nor pervasive enough to alter the conditions

of Manatt's employment.  Id. at 799.

I conclude that Tu has not raised a factual issue that the conduct to which she was

subjected was severe or pervasive enough to support a hostile environment claim based on her

race or national origin.  Although the remarks made by Tu's co-workers are crass, and I do not

condone the behavior, there is not enough evidence to support her claim:

> These standards for judging hostility are sufficiently demanding to ensure
> that Title VII does not become a "general civility code."  Properly applied, they
> will filter out complaints attacking "the ordinary tribulations of the workplace,
> such as the sporadic use of abusive language, gender-related jokes, and occasional

teasing." We have made it clear that conduct must be extreme to amount to a
change in the terms and conditions of employment . . . .

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Accordingly, I grant summary judgment and dismiss Tu's race and national origin hostile

environment federal and state claims.

C.    Retaliation

Tu alleges claims for retaliation under Title VII, the Americans with Disabilities Act

("ADA"), and ORS Ch. 659A covering both race/national origin and disability. Kaiser seeks

summary judgment by attacking Tu's prima facie case. Neither Tu nor Kaiser try to differentiate

between the different statutes underlying the retaliations claims.

To establish a Title VII retaliation claim, a plaintiff can establish a prima facie case by

establishing the following factors: (1) involvement in a protected activity; (2) an adverse

employment action; and (3) a causal link between the activity and the employment action. If the

plaintiff establishes the prima facie case, the burden shifts as in a disparate treatment case. Porter

v. California Dept. of Corrections, 419 F.3d 885, 894 (9th Cir. 2005).

Kaiser first argues that there is no evidence Tu suffered from conduct that meets the

definition of an adverse employment action used in the context of a retaliation claim.

An adverse employment action is adverse treatment that is reasonably likely to deter

employees from engaging in protected activity. Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir.

2000) (new policies that decreased pay, decreased the amount of time to complete the same

amount of work, and decreased the ability to influence workplace policy were found to be

adverse employment actions); Poland v. Chertoff, 494 F.3d 1174, 1180 (9th Cir. 2007) (initiation

of an investigation and a transfer across the country were adverse employment actions).

Employment decisions that can constitute an adverse employment action include termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review, and refusal to consider for promotion.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Other employment decisions are not sufficient to deter reasonable employees from complaining about Title VII violations and, thus, are not considered adverse employment actions.  These include declining to hold a job open for an employee, "badmouthing" an employee outside of the job reference context, transferring an employee where salary is unaffected, ostracism at the hands of co-workers, and work assignments with the harasser's friends as long as the friend shows no outward signs of hostility.  Id.  at 928-29. Moreover, actions which are subject to appeal, such as negative performance reviews and shift and vacation assignments, are not sufficiently final to constitute an adverse employment action. Id. at 929-30.

Tu relies on the following conduct as adverse employment actions caused by her complaints.

First, Tu argues that DeCicco refused to transfer her from her harassers, cut her pay when he finally allowed her to transfer, and offered her a specialist position in her original department but made it contingent on going back to the same porcelain room with her harassers.  Tu contends that she was denied the temporary specialist position in violation of the CBA.

As explained above, the evidence does not support these arguments.  Tu was not transferred against her will between the fixed and removable departments.  She applied for an open position which was graded at a lower salary range prior to Tu's application.  Likewise, when Tu was interested in moving to an open position back in the fixed department, she was not entitled to Kaiser changing the nature of the position, including where she would sit.  Finally, the

CBA expressly does not allow a job change within three months of the last job change. Kaiser did not violate the CBA by enforcing this provision in it.

Tu next argues that DeCicco failed to expedite the investigation into her allegations. One week passed between October 24, when Tu told DeCicco about the harassment, and his meeting with Tu, Ferguson from Human Resources, and others to discuss the problem. Ferguson then began interviewing other employees. Although Tu was not happy with the result, an investigation was conducted quickly enough that a reasonable jury could not find that any delay was reasonably likely to deter other employees from engaging in protected activity.

In her final argument, Tu contends that after French assaulted her, Ellis failed to conduct an investigation or discipline French, all in retaliation for Tu's recently filed BOLI complaint.

There is evidence that Ellis talked to Swindell, to Tu, and to French. There is no evidence that French was disciplined in any way other than this discussion but Ellis did tell French that future incidents would not be tolerated. Importantly, there is no evidence that French did anything after the hot waxiron incident to harass Tu. I again conclude that Tu has not raised a factual issue that Ellis' response to the incident with French was reasonably likely to deter other employees from engaging in protected activity.

I also note that Tu filed her BOLI complaint only two days before the hot waxiron incident. There is no evidence in the record that Ellis knew about the BOLI complaint close to the time of the incident, if ever. Thus, Tu has not raised a factual issue on the causation between her BOLI complaint and Ellis' response to French's conduct.

Tu has not established her prima facie case sufficiently to survive summary judgment on the retaliation claims she alleges under Title VII, ORS Ch. 659A, and the ADA. I grant summary judgment and dismiss all retaliation claims.

Page 25 - OPINION AND ORDER

II.    Disability Discrimination

Tu alleges claims against Kaiser for disability discrimination under the ADA and

ORS Ch. 659A.

The ADA prohibits discrimination against a qualified individual with a disability.

42 U.S.C. § 12112(a).  Discrimination includes both treating an individual differently in regard to

the terms, conditions, and privileges of employment as well as failing to provide a reasonable

accommodation to an otherwise qualified individual with a disability.  Id. §§ 12112(a), (b)(5).

I decided above that much of the conduct on which Tu relies does not amount to an

adverse employment action which can support a disparate treatment claim.  The same is true

under the ADA.  I will address Tu's failure to accommodate claim in which she alleges that she

could not return from her medical leave due to Kaiser's failure to accommodate her disability.

To establish a prima facie case for failure to accommodate under the ADA, a plaintiff

must show:  (1) he is a disabled person within the meaning of the Act; (2) he is a qualified

individual able to perform the essential functions of the job with reasonable accommodation; and

(3) he suffered an adverse employment action because of the disability.  Allen v. Pacific Bell,

348 F.3d 1113, 1114 (9th Cir. 2003).

A.    Causation/Notice

Kaiser attacks the causation element by arguing that it was not aware of Tu's alleged

impairment until she filed her first BOLI charge on September 5, 2006.

I am unconvinced by this argument.  On October 24, 2005, Tu gave Dr. Leung's letter to

DeCicco which read:

> [Tu] is currently under my clinical care.  It is my professional opinion that
> due to a very unfriendly and hostile working environment she has been distressed

greatly.  I would advocate for a change of work site or position to avoid further damage done to her health and mental health condition.

Tu. Aff. Ex. 23.

This is sufficient to put Kaiser on notice that Tu's psychiatrist was requesting an accommodation for her, a change of work site or position.

B.    Qualifying Disability

Kaiser then argues that Tu does not have a qualifying disability.  Tu argues that she suffers from anxiety, depression, and post traumatic stress disorder which affect her sleeping and thinking.

"Disability" is defined in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).

The federal regulations that implement the ADA state that the term "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i)-(ii).  The court must also consider "the mitigating measures the person uses, their effectiveness, their side effects and their burdens" when addressing what limitations the individual actually faces.  Fraser v. Goodale, 342 F.3d 1032, 1039 (9th Cir. 2003), cert. denied, 541 U.S. 947 (2004).

1.    Sleeping

Sleeping is a major life activity.  Head v. Glacier Northwest Inc., 413 F.3d 1053, 1060 (9th Cir. 2005).  The plaintiff in Head would "pass out" for a while immediately after getting

home from work, would get five or six hours of sleep a night even when using sleep medications, was drowsy during the day due to the medications and lack of sleep, and some nights could not get to sleep for hours or even at all.  The court held that this was sufficient to raise a genuine issue of material fact on whether the plaintiff was substantially limited in the major life activity of sleeping.  Id.  Cf. Pack v. Kmart Corp., 166 F.3d 1300, 1306 (10th Cir.) (plaintiff not substantially limited in sleeping when during a 13 month period she slept two or three hours some nights, awoke without feeling rested, felt extremely drowsy and sleepy all the time, and took prescription sleep medication), cert. denied, 528 U.S. 811 (1999); Swanson v. University of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001) (plaintiff not substantially limited when he slept four to five hours a night).

Tu has frequent nightmares of distressing events at work, only sleeps from 10:00 PM to 3:00 AM at the most, and never feels like she gets a good night's sleep.  Medication has not eliminated the symptoms.

Tu is getting less sleep than described in Head  and about the same as described in Swanson but Tu also has to cope with frequent nightmares.  She does not claim to function normally with little sleep.  Consequently, I find that Tu has raised a factual issue on whether she is disabled because of her inability to sleep.

2.    Thinking

Thinking is a major life activity.  Head, 413 F.3d at 1061.  The plaintiff in Head could not stay focused for more than brief periods, did not have much of a short-term memory at all, had to be repeatedly reminded of appointments or tasks, could only look at written material for short periods or it became jumbled, could not focus on an entire television show, and had to quit

school because of inability to concentrate.  The court found that he was substantially impaired.

Id.

Tu is easily startled and frightened and is unable to focus her thoughts.  Her work output

has slowed down and she has trouble meeting her production requirements at the new job.  She

cannot drive because of concentration problems.  Medication has not eliminated the symptoms.

Although Tu appears to have less difficulty thinking than in Head, she has again raised a factual

issue on whether she is disabled because of her difficulty thinking.  In particular, her work

production is quantifiable and there is evidence that Tu's production lessened in her new job,

even though she is removed from the environment she found harassing in the Kaiser dental lab.

C.      Reasonable Accommodation

Kaiser raises several arguments to support its claim that it had no duty to find a

reasonable accommodation for Tu.  Kaiser first argues that she could perform the essential

functions of her job without accommodation.  Although this may have been true at first, it was no

longer true when Dr. Leung put Tu on sick leave for six months starting on December 7, 2006.

Kaiser then contends that it engaged in an appropriate interactive process with Tu even

though it had no obligation to do so.  Kaiser also notes that Tu turned down its offer to move her

from the porcelain room to the main laboratory.

> Once an employer becomes aware of the need for accommodation, that
> employer has a mandatory obligation under the ADA to engage in an interactive
> process with the employee to identify and implement appropriate reasonable
> accommodations. . . . The interactive process requires communication and good-
> faith exploration of possible accommodations between employers and individual
> employees, and neither side can delay or obstruct the process. . . .
>
> Moreover, we have held that the duty to accommodate is a continuing duty
> that is not exhausted by one effort. . . . Thus, the employer's obligation to engage
> in the interactive process extends beyond the first attempt at accommodation and
> continues when the employee asks for a different accommodation or where the

employer is aware that the initial accommodation is failing and further accommodation is needed.

Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1137-38 (9th Cir. 2001) (internal

quotation and citation omitted), cert. denied, 535 U.S. 1011.

Especially in light of the fact that Dr. Leung removed Tu from the workplace for six months, a jury could find that Kaiser did not fulfill its continuing duty to accommodate after Tu declined to be moved as the only change because she would still have to work with her co-workers.

Last, Kaiser argues that Tu's requested accommodation was not reasonable as a matter of law. It interprets case law to mean that a request to transfer away from a supervisor is not a reasonable accommodation, as a matter of law. Tu, however, provides evidence that she was primarily harassed by her co-workers, not by her managers. There is evidence in the record that others transferred back and forth between the fixed and removable department and in and out of the porcelain room. There is evidence that most of the employees were specialists, like Tu, rather than lower-paid technicians. From Dr. Leung's notes, Kaiser had awareness of Tu's situation from October 2005 until she went out on a six-month medical leave in December 2006, during which Tu applied for jobs.

The plaintiff has the burden of showing that a reasonable accommodation existed that would have enabled him to perform the essential functions of an available job. "To avoid summary judgment, however, [the plaintiff] need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases." Dark v. Curry County, 451 F.3d 1078, 1088 (9th Cir. 2006) (internal quotation omitted), cert. denied, 127 S. Ct. 1252 (2007).

I conclude that Tu has met the burden to survive summary judgment.

D.    Summary

I grant summary judgment on Tu's disparate treatment disability claims and deny it for

her failure to accommodate claims.

III.    Injured Workers' Discrimination

Tu alleges that Kaiser discriminated against her for filing a workers' compensation claim

by not hiring her for any of the twelve positions for which she applied.  In particular, Tu argues

that she is a certified phlebotomist but was denied a position as a phlebotomist.

Kaiser argues there is no evidence that any of the hiring decision makers knew anything

about Tu's workers' compensation claim.  Thus, the hiring managers could not have decided not

to hire Tu because she filed the claim.  Kaiser also argues there is no evidence Tu was qualified

for any of the open positions and notes that her phlebotomy certification from approximately

15 years ago was no longer good and her training was outdated.

To prove a prima facie case of retaliation under Oregon's injured workers' law, a plaintiff

must establish:  (1) plaintiff invoked the workers' compensation system; (2) plaintiff was

discriminated against in the tenure, terms or conditions of employment; and (3) the employer

discriminated against plaintiff because he invoked the workers' compensation system.  Williams

v. Freightliner, LLC, 196 Or. App. 83, 89, 100 P.3d 1117 (Or. App. 2004).

I will concentrate on the third element.  Tu argues causation based on the large number of

positions to which she applied but was not hired, her dated phlebotomist certification, and her

experience in Viet Nam as a dentist and running a dental lab.  Her arguments are not evidence

that she was qualified for many of the positions, however.  Tu applied for a wide range of jobs,

including operating room technician, assistant to the dental director, and cost analyst.  She

conceded that she would need training to do most of the jobs.  More importantly, however, is that

Tu has no evidence that any of the hiring managers knew of her workers' compensation claim. There is evidence that Ferguson knew of Tu's applications, but no evidence that he spoke to the hiring managers. Thus, Tu has failed to raise a factual issue on causation.

I grant summary judgment and dismiss Tu's injured workers' discrimination claim.

IV.    Common Law Torts

Tu alleges claims for the intentional infliction of emotional distress, assault, and battery against French and against Kaiser under a theory of vicarious liability. Tu bases her claims on French's conduct of shooting rubber bands at Tu, throwing soft dental material at Tu, calling Tu a racially derogatory name once, and threatening Tu with a heated waxiron spoon.

A.    Kaiser's Possible Liability

Kaiser seeks summary judgment against all of the common law torts. Kaiser claims that it cannot be vicariously liable because French was acting outside the course and scope of her employment.

Tu argues that Kaiser management acquiesced in French's horseplay aimed at her. According to Tu, a jury could find that French's conduct occurred while she was jointly engaged in tasks with Tu in the dental lab, such as locating tools and assisting with the acquisition of dental materials. Based on this, Tu contends that French's conduct resulted from the exercise of French's employment duties and is thus within the course and scope of her employment.

Three requirements must be met to conclude that an employee is acting within the scope of employment: (1) the conduct must have occurred substantially within the time and space limits authorized by the employment; (2) the employee must have been, at least partially, motivated by a purpose to serve the employer; and (3) the act must have been of a kind the employee was hired to perform. Lourim v. Swensen, 328 Or. 380, 385, 977 P.2d 1157 (1999)

Page 32 - OPINION AND ORDER

(quoting <u>Chesterman v. Barmon</u>, 305 Or. 439, 442, 753 P.2d 404 (1988)).  Whether a person has

acted within the scope of employment is normally a question of fact.  <u>Walthers v. Gossett</u>, 148

Or. App. 548, 559, 941 P.2d 575 (Or. App. 1997).  "The focus is not on whether the [tortfeasor]

acted in [the employer's] interest or whether [the tortfeasor] was hired to sexually harass

plaintiff.  Rather, the focus is whether the acts complained of resulted from or were the

outgrowth of the exercise of [the tortfeasor's] employment duties."  <u>Harris v. Pameco Corp.</u>, 170

Or. App. 164, 173, 12 P.2d 524 (2000) (claims for sex discrimination and battery).  <u>See also</u>

<u>Vinsonhaler v. Quantum Residential Corp.</u>, 189 Or. App. 1, 6, 73 P.2d 930 (2003) ("The focus of

the inquiry is not necessarily whether an employee's tortious conduct itself was intended to serve

the employer but, rather, whether the employee engaged in conduct that was intended to serve the

employer and that conduct resulted in the acts that injured the plaintiff.").  Consequently,

plaintiffs have sufficiently alleged respondeat superior claims by alleging that a priest acted to

serve the Archdiocese when he cultivated a relationship of trust with the plaintiff that led to the

abusive conduct, <u>Fearing v. Bucher</u>, 328 Or. 367, 977 P.2d 1163 (1999), and by alleging a Boy

Scout leader cultivated a relationship of trust with the plaintiff Boy Scout and his family which

resulted in abuse, <u>Lourim v. Swensen</u>, 328 Or. 380, 977 P.2d 1157 (1999).  In contrast,

<u>Vinsonhaler</u> affirmed summary judgment and held that there was no evidence the apartment

manager engaged in any type of conduct that was intended to serve the apartment owner but

which resulted in sexual harassment of his assistants.  <u>Vinsonhaler</u>, 189 Or. App. at 6.

 In the event Kaiser is unsuccessful on its scope of employment argument, it adopted

French's arguments on the merits of the torts, as discussed below.

 French had no supervisory authority over Tu and had no duties which required her to

cultivate a relationship of trust with Tu.  As in <u>Vinsonhaler</u>, there is no evidence that the work

French performed for Kaiser resulted in harassment of Tu.  The fact that French and Tu might jointly engage in peripheral tasks is a weaker case than <u>Vinsonhaler</u>, in which a supervisory relationship existed.

Tu has failed to raise a factual issue that French was partially motivated to serve Kaiser and that the act was of a kind French was hired to perform.  Accordingly, I grant summary judgment and dismiss the intentional infliction of emotional distress, assault, and battery claims alleged against Kaiser.

B.    <u>Assault and Battery</u>

French argues that she is not liable for assault and battery because there is no evidence that she intended to cause offensive contact with Tu.  According to French, the evidence is of an intent to do a reckless or wanton act, at most, and not an intent to injure.  Tu notes that during the hot waxiron incident, French ignored Tu imploring her to stop.  Tu contends this raises a factual issue on whether French intended to cause offensive conduct and intent to cause offensive conduct is sufficient for the torts.

"A battery is a voluntary act that is intended to cause the resulting harmful or offensive contact.  It is not necessary that the contact do actual physical harm–it is sufficient if the contact is offensive or insulting."  <u>Harris v. Pameco Corp.</u>, 170 Or. App. 164, 169, 12 P.3d 524 (2000) (internal quotation omitted).  An assault is "an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect."  <u>Cook v. Kinzua Pine Mills Co.</u>, 207 Or. 34, 48, 293 P.2d 717 (1956).

> [A]n intentional act causing unpermitted physical contact with the person of another does not necessarily amount to an assault and battery.  We must distinguish between an intent to do an act which may be wilful or wanton and which may result in contact, on the one hand, and an act involving an intent to cause harmful or offensive contact with the person, on the other.  An assault and

> battery involves more than an intentional act. There must be the intent to injure.
> However, the authorities plainly indicate that the word "injure" refers to legal
> injury, a violation of a protected right of the one assaulted. It does not necessarily
> mean bodily and physical injury. An offensive unpermitted touch may be a
> battery though no physical damage results.

Id. at 48-49.

I will concentrate on the hot waxiron incident. As Tu describes it, French pinned her to the chair for five to ten minutes while French waived a dangerously hot instrument around Tu's chest and face. French taunted Tu and told Tu that she could burn her now. French is a much bigger woman than Tu. French ignored Tu's cries to stop and had to be told twice by Swindell to put the instrument down before complying.

This version of the events is easily adequate for a jury to find that French intended to injure Tu in the sense of invading her personal space and bodily integrity, if not to injure Tu physically.

Consequently, I deny French's motion and leave the assault and battery claims for trial.

C.    Intentional Infliction of Emotional Distress

French seeks summary judgment dismissing Tu's claim for intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress contains the following elements:

> (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2)
> the defendant's acts were the cause of the plaintiff's severe emotional distress, and
> (3) the defendant's acts constituted an extraordinary transgression of the bounds
> of socially tolerable conduct.

McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 841 (1995). Intent is defined to mean

"where the actor desires to inflict severe emotional distress, and also where he knows that such

distress is certain, or substantially certain, to result from his conduct." Id. at 550 (emphasis

omitted).

"Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be

actionable, and] . . . insults, harsh or intimidating words, or rude behavior ordinarily [do not]

result in liability even when intended to cause distress." Watte v. Edgar Maeyens, Jr., 112 Or.

App. 234, 239, 828 P.2d 479, 481 (1992) (quoting Hall v. The May Dept. Stores, 292 Or. 131,

135, 637 P.2d 126, 129 (1984)).  In addition, Oregon cases which have allowed claims for

intentional infliction of emotional distress to proceed typically involve acts of psychological and

physical intimidation, racism, or sexual harassment.  See Babick v. Oregon Arena Corp., 333 Or.

401, 413, 40 P.3d 1059 (2002) (defendant's release of intoxicated and violent concertgoers who

had been detained by plaintiffs presented a threat of imminent physical harm that was presumed

grave); Kraemer v. Harding, 159 Or. App. 90, 976 P.2d 1160 (1999) (continued accusations that

a school bus driver was a child sex abuser after multiple investigations concluded that no

inappropriate conduct occurred); Wheeler v. Marathon Printing, Inc., 157 Or. App. 290, 974 P.2d

207 (1998) (co-worker continued harassment including sexual remarks even after plaintiff

attempted suicide); Lathrope-Olson v. Dept. of Transportation, 128 Or. App. 405, 408, 876 P.2d

345 (1994) (calling a Native American woman a squaw, telling her that a squaw was supposed to

walk behind her man, stating that all women were good for was between their legs, locking her

out of the work van in the rain and snow, and threatening to push her into the path of oncoming

vehicles); Mains v. II Morrow, Inc., 128 Or. App. 625, 877 P.2d 88 (1994) (supervisor's physical

assaults, including touching plaintiff's breasts, shoving plaintiff, grabbing plaintiff's ankles,

blocking plaintiff's car, and encouraging other men to do the same, and daily sexual comments);

Franklin v. Portland Community College, 100 Or. App. 465, 787 P.2d 489 (1990) (supervisor

Page 36 - OPINION AND ORDER

called an African-American male by the name "boy," issued false reprimands, shoved him,

locked him in an office, and suggested that he apply elsewhere for employment).

Whether conduct constitutes an extraordinary transgression of the bounds of socially

tolerable conduct is initially a question of law. Delany v. Clifton, 180 Or. App. 119, 129, 41

P.3d 1099 (2002).

French argues that her conduct is mere horseplay which is insufficiently outrageous to

support the tort. She notes that Tu also took part in shooting rubber bands and contends that the

two had a cordial relationship. French characterizes the hot waxiron incident as possibly

warranting discipline but insufficient to support Tu's claim.

Again, I will concentrate on the hot waxiron incident. The threat of imminent physical

harm can be outside the bounds of socially tolerable behavior. Here, French is much bigger than

Tu, she was wielding a weapon which could burn Tu severely, and she ignored Tu's pleas to

stop. The threat of physical harm to Tu was much greater than in Babick, where plaintiffs were

exposed to a vengeful mob, because French had Tu pinned in her chair. The threat in Babick was

more speculative because the mob had not turned violent.

Tu has proffered evidence sufficient to survive summary judgment on this element of the

tort.

French next contends that Tu cannot raise a factual issue that French intended to cause

her severe emotional distress. Tu argues that there is a factual issue on whether French was

aware that her conduct was substantially certain to result in severe emotional distress. In

particular, Tu contends that French's racial slur is evidence of malice towards Tu as well as the

fact that French ignored Tu repeatedly imploring her to stop.

The analysis is similar to that for the assault and battery claims. Tu has raised a factual issue that French knew that severe emotional distress was substantially certain to result from her conduct.

French's next argument is that Tu did not suffer severe emotional distress. French notes that Tu denied any upset immediately after the hot waxiron spoon incident, did not call security, did not run to the bathroom crying as she had in the past, did not ask for a transfer, and did not report that incident to her physician or her union representative until nearly three months later.

Tu argues that this is also a factual issue, based on her testimony and the medical care she received after the hot waxiron incident.

Again, I am unpersuaded by French's arguments because of the evidence of psychological care Tu receives.

Finally, French argues that her conduct was not a direct cause of any emotional distress suffered by Tu because Tu began suffering from depression more than two years earlier and has alleged claims against Kaiser based on conduct from other co-workers.

I cannot determine as a matter of law whether the hot waxiron incident increased Tu's emotional distress. French's argument is one for the jury.

In sum, I deny French's motion for summary judgment against the intentional infliction of emotional distress claim.

///

///

///

## CONCLUSION

Defendant Kaiser's Objections to the Affidavits of Plaintiff and Mary Ann Sierks (#97), Defendant French's Motion to Strike Inadmissible Testimony and Evidence Offered by Plaintiff in Opposition to Defendant's Motion for Summary Judgment (#105), Plaintiff's Objections to Defendant French's Evidence Proffered in Support of her Motion for Summary Judgment (#107), and Plaintiff's Objections to Defendant Kaiser Foundation Northwest's Evidence Proffered in Support of its Motion for Summary Judgment (#108) are granted in part.  Defendant Kaiser's Motion for Summary Judgment (#42) is granted in part.  Defendant Denise French's Motion for Summary Judgment (#53) is denied.

IT IS SO ORDERED.

Dated this _____19th_____ day of August, 2008.


_/s/ Garr M. King_____
Garr M. King
United States District Judge